UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA

        -v.-

THE PREMISES KNOWN AND
DESCRIBED AS 15 WEST 139 ST.
APT. 15K, NEW YORK, NEW YORK
AND ANY CLOSED CABINETS
AND CONTAINERS FOUND THEREIN.
------------------------------------x

AFFIDAVIT IN SUPPORT
OF SEARCH WARRANT

FILED UNDER SEAL

STATE OF NEW YORK          )
                                  ) ss.:
SOUTHERN DISTRICT OF NEW YORK )

       TOMMY KILBRIDE, being duly sworn, deposes and says:

       1.  I am a Special Agent with Immigration and Customs Enforcement, Department of Homeland Security, and am currently assigned to the United States Marshals Service Regional Fugitive Task Force. I have been a Special Agent for approximately 17 years, and have been assigned to the current unit for approximately 11 years. My primary area of responsibility includes the apprehension of illegal aliens and the investigation of unlawful activities conducted by illegal aliens, including narcotics trafficking and unlawful possession of firearms. Over the past 17 years, I have investigated federal narcotics violations which have led to the arrest and conviction of numerous narcotics distributors. I have received training in the recognition of illicit narcotics, their common packaging, and the paraphernalia used for ingestion, as well as the structure of narcotics organizations. I have myself conducted, as well as

assisted other law enforcement officers with, numerous drug trafficking investigations and I am familiar with the operations of drug trafficking organizations. I have participated in numerous surveillances, search warrants and arrests of persons involved in illegal drug activity. I have also conducted and participated in debriefings of subjects of narcotics investigations and cooperating individuals.

2. This affidavit is respectfully submitted, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, in support of the Government's application for a warrant to search the premises known and described as 15 WEST 139TH ST., APARTMENT 15K, NEW YORK, NEW YORK (the "PREMISES") AND ANY CLOSED CABINETS AND CONTAINERS FOUND THEREIN.

3. This affidavit is based, in part, upon information provided to me by other law enforcement officers. Since this affidavit is being submitted for the limited purpose of securing authorization for the search of an apartment, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of the search warrant requested herein.

4. Based on the information set forth in this affidavit, I respectfully submit that there is probable cause to believe that the PREMISES presently contains evidence, fruits and

instrumentalities of violations of federal law, including violations of Title 21, United States Code, Section 841; and Title 18, United States Code, Sections 924(c) and 922(g)(5). Such evidence consists of the items set forth in Attachment A to this affidavit.

## PREMISES

5. The PREMISES is a single studio apartment in an apartment building (the "APARTMENT BUILDING") located on the north side of 139th STREET between Fifth Avenue and Lenox Avenue in Manhattan, New York. The building is located within the Delano Village housing complex. The building is a red brick building with 17 floors. The building number "15" is imprinted on the awning above the glass door entrance to the building. The PREMISES is Apartment "15K." The PREMISES has a white steel door, with the number "15K" affixed to the door, and is located on the fifteenth floor of the apartment on the right side after exiting from the elevator.

## THE INVESTIGATION

6. This investigation began when a cooperating witness ("CW") alerted law enforcement agents to an individual engaged in the sale of marijuana. The CW has been working with me and other law enforcement agents for approximately 17 months. During this 17-month period, the CW has provided me and other agents with detailed and credible information concerning firearms

00021

and narcotics trafficking in the New York City area. Moreover, the information provided by the CW has proven accurate and reliable and has led to the arrests of 10 individuals for offenses ranging from parole violation to homicide, attempted homicide, and narcotics trafficking.

7. About two months ago, the CW called to inform me that he was at the apartment of an acquaintance whom he has known from the neighborhood for about a year and a half, an individual whom I subsequently identified as Cornell Carr ("the Subject"). The Subject's apartment is located at 15 West 139 St., Apt. #15K, New York, New York. While inside the Premises, the CW observed a large quantity of marijuana stored in the closet of the studio apartment.

8. Within the past two weeks, the CW was invited inside the Premises by the Subject on three other occasions, and each time he observed a large quantity of marijuana in the same closet. While the quantity of marijuana varied somewhat each time the CW was inside the Premises, the CW estimates from his visual observation that the marijuana weighed as much as 15 pounds. On two of these visits — the first time about two weeks ago, and the other time approximately 7 days ago — the CW also observed the Subject carrying a black semi-automatic pistol in his waistband.

4

9.  From the information provided to me by the CW, I was able to identify the Subject as Cornell Carr and retrieve his immigration file. From reviewing the Subject's immigration documents, I determined that he is in the United States illegally. Under Title 18, United States Code, Section 922(g), it is unlawful for an alien "illegally or unlawfully in the United States" to possess "any firearm or ammunition."

10. On or about August 6, 2007, I showed the CW a photograph of the Subject that I obtained from the Subject's immigration file. The CW confirmed that the person in the photograph is the individual whom he saw carrying the black semi-automatic pistol in his waistband, and whose apartment the CW had visited and observed the approximately 15 pounds of marijuana in the closet.

## DRUG TRAFFICKERS COMMONLY KEEP CERTAIN ITEMS IN THEIR HOMES

11. Based on my training and experience, my personal participation in this and other investigations involving illegal drug activity, and extensive conversations with other Federal Agents and police officers who are knowledgeable of drug-trafficking investigations, I know that:

(a) Individuals who traffic in illegal controlled substances maintain books, records, receipts, notes, ledgers, money orders, money counters, bank records, currency, safe deposit box keys, telephone calling cards, address books,

5

00023

telephone numbers, pager numbers, photographs and other papers relating to the transportation, storage, order, sale and distribution of controlled substances. Also, these items are generally maintained in the trafficker's residence (or residences of associates, friends or relatives) in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses, or in business locations with which the trafficker is associated and where the trafficker has ready access to these items. Although quantities of narcotics sometimes move very quickly from one location to another as they are sold, records and documents and electronic devices frequently are maintained in these locations on a continuing basis and for long periods. It is also common practice for drug traffickers to utilize safes within their premises to safeguard and facilitate the concealment of the above described items;

    (b) Drug traffickers routinely conceal in their residence or the residences of family members, friends and associates, as well as their business locations, and/or in places used by drug traffickers to conduct their drug distribution activity (such as automobiles, stash houses or safe houses) large quantities of currency, financial instruments, precious metals, jewelry and other items of value, which are typically the proceeds of illegal controlled substance transactions;

00024

(c) It is also common for drug traffickers to secrete contraband related to their drug trafficking activity, such as scales, razors, packaging materials, cutting agents, cooking utensils, strainers, microwave ovens, pots, dishes and other containers for preparing controlled substances for distribution, at their residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;

(d) Drug traffickers commonly maintain telephone number and address books, or papers which reflect names, addresses and/or telephone numbers for other associates of their illegal organization. These individuals often utilize telephones, cellular telephones and pagers to maintain contact with other associates of their illegal businesses, and these telephone records, bills and pager numbers are often found in their places of residence, or the residences of family members, friends or associates, in their business locations, or in places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;

(e) Drug traffickers often take photographs of themselves, their associates, their property and illegal contraband. These photographs are usually maintained in their places of residence, or the residences of family members, friends

7

or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;

 (f) Drug traffickers often own, possess and use weapons to facilitate their illegal drug trafficking activities. These weapons are most often secreted in their places of residence, or the residences of family members, friends or associates, in their business locations, or in the places used by drug traffickers to conduct their drug distribution activity, such as stash houses or safe houses;

 (g) Drug traffickers often use safe deposit boxes to amass, retain and conceal their illegal proceeds to avoid detection. Deposits to bank accounts create an accessible record of deposits, withdrawal and transfer of funds and banks are required to report cash transactions in excess of $10,000 to the Internal Revenue Service. Safe deposit boxes, which are readily accessible to drug traffickers, provide a "safe haven" for illegal drug proceeds where there is no such accounting;

 (h) Drug traffickers often use coded language and terms to disguise conversations about their drug activities. Drug traffickers also frequently use electronic paging devices commonly known as "pagers" or "beepers" to communicate with co-conspirators. A common technique among drug traffickers is to transmit pre-arranged numerical codes to the pager to communicate

00026

information, such as price or quantity of drugs, to the individual in possession of the pager; and

(i) Computer hardware, software, documentation, passwords, data security devices, and data may be integral tools of narcotics trafficking and money laundering and may constitute the means of committing these and other crimes. Traffickers often keep computers and computer related equipment in their home and utilize the equipment to keep detailed records of their narcotics transactions. Various computer software programs originally designed for balancing home finances are often utilized by traffickers to keep track of drug profits and to launder the money earned through illicit narcotics trafficking. In addition, because information can be easily hidden in a computer in a manner that would prevent immediate identification (for example, coded file names or encryption) and because computer storage devices can be used to store the equivalent of thousands of pages of information (which could take weeks or months to sort), it is often necessary to seize an entire computer system so that a qualified computer expert can accurately retrieve the system's data in a controlled laboratory setting.

### REQUEST TO SEARCH THE PREMISES

12. In light of the foregoing information, and based on my experience and training, I submit that there is probable

00027

cause to believe that at this time at the PREMISES there is evidence of violations of Title 21, United States Code, Section 841; and Title 18, United States Code, Sections 924(c) and 922(g)(5), including the items described in Attachment A, attached.

13. Based on my training and experience investigating narcotics trafficking, I know that narcotics traffickers, particularly those involved in high volume sales, must maintain written records of their transactions in order to pay their suppliers and workers. They also must maintain materials to facilitate their trafficking activities, such as, for example, money counting machines, notebooks, and scales. Although quantities of narcotics sometimes move very quickly from one location to another as they are sold, records and documents and electronic devices frequently are maintained in these locations on a continuing basis and for long periods. Narcotics traffickers often maintain in their residences, for example, the names and phone numbers of their suppliers, the proceeds from narcotics activity, and mobile telephones and pagers (and related documents) used in communicating with workers and suppliers.

### PROPERTY TO BE SEIZED

14. The evidence, fruits and instrumentalities of the offenses include the following:

00028

(a) Any and all narcotics, as well as books, records, receipts, notes, ledgers and other papers relating to the transportation, ordering, purchasing and distribution of controlled dangerous substances;

(b) Papers, tickets, notes, schedules, receipts and other items relating to domestic and foreign travel;

(c) Books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, cashier's checks, bank checks, safe deposit box keys, money wrappers, and other items evidencing the obtaining, secreting, transfer and/or the concealment of assets and the obtaining, secreting, transfer, concealment and/or the expenditure of money;

(d) Electronic equipment and the contents therein, such as computers, telex machines, facsimile machines, currency counting machines, telephone answering machines, electronic calendars and address/telephone devices, and related manuals used to generate, transfer, count, record and/or store the information, as well as the data contained therein;

(e) Any and all drug proceeds, including but not limited to United States currency, precious metals, jewelry and financial instruments, and stocks and bonds;

(f) Photographs, including still photographs, negatives, videotapes, film, undeveloped film and the contents

11

00029

therein, slides, in particular photographs of ~~co-conspirators, assets and/or~~ controlled dangerous substances; TVIC TVIC

(g) Address and/or telephone books, rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex number of co-conspirators, ~~sources of supply, customers, financial~~ institutions, and other individuals or businesses with whom a financial relationship exists;

(h) Paraphernalia for packaging, cutting, weighing and distributing controlled substances, including but not limited to scales, baggies and spoons;

(i) Indicia of occupancy, residency, rental and/or ownership of the premises and/or of vehicles described herein, including but not limited to utility and telephone bills, cancelled envelopes, rental, purchase or lease agreements, and keys;

(j) Firearms and ammunition, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons, and any records or receipts pertaining to firearms and ammunition;

(k) Cellular telephones and pagers, as well as any information contained therein.

(l) Computer(s), computer hardware, software, related documentation, passwords, data security devices (as

described below), videotapes, vide storage devices, and data were instrumentalities of and will contain evidence related to this crime.

(m) The following definitions apply to the terms as set out in this affidavit and attachment:

(1) Computer hardware consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Hardware includes any data-processing devices (including but not limited to central processing units; internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including but not limited to keyboards, printer, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including but not limited to physical keys and locks).

(2) Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, or other digital form. It commonly

13

includes programs to run operating systems, applications, and utilities.

(3) Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

(4) Passwords and Data Security Devices: Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which preform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

(n) Any of the items described in paragraphs (a) through (l) above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment,

00032

including floppy diskettes, fixed hard disks, or removable hard disk cartridges, software or memory in any form. The search procedure of the electronic data contained in computer operating software or memory devices may include the following techniques:

(1) surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

(2) opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

(3) scanning storage areas to discover and possibly recover recently deleted files;

(4) scanning storage areas for deliberately hidden files; or

(5) performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

15. This warrant and this search procedure specifically excludes a search of any kind of unopened electronic mail. No search of unopened electronic mail shall be conducted without a separate search warrant supported by probable cause. Appropriate efforts shall be made to minimize the disclosure of

00023

records and other information which are not the subject of this warrant.

WHEREFORE, I respectfully request that a search warrant be issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure authorizing agents from the Immigration and Customs Enforcement and the United States Marshals Service, with proper assistance from other law enforcement officers, to search the PREMISES, and authorizing the seizure of any item listed in Attachment A to this affidavit.

_____
TOMMY KILBRIDE
Special Agent
Immigration and Customs Enforcement

Sworn to and subscribed before me this
__ day of August, 2007.

_____        AUG 0 8 2007
United States Magistrate Judge

KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

16

00034